Withers, J.
(absent at extra Courts,) delivered, per Frost, J. the following dissenting opinion :
Not knowing what may be said in behalf of the minority of the Court of Errors, I desire to express some views in vindication of the conclusion to which my mind has been conducted upon the leading question presented by this cause.
I shall leave untouched whatever concerns the pleadings, as they are, or as they should be. The equity jurisdiction, from which this case comes, is more competent to adjust the pleadings than the law Court itself, and infinitely more so than an ill-informed member of it. I do not, therefore, presume to consider whether the complainant’s till will sustain, without amendment, a decree in his behalf, for the sum of $3800 advanced by him, to the Ocmulgee Bank, after the 7th Nov. 1842; nor whether all bill holders and other creditors shall be made parties in these proceedings; nor whether a full payment of stock subscribed should not be required, as constituting a corporate fund, primarily liable, before an “ ultimate” liability can be enforced against an individual stockholder in his personal character, and so forth.
The only question I intend to discuss, is that alone, as I am informed, which brought the case before this Court, to *360 wit whether the complainant is one who holds bills issued by or from the Ocmulgee Bank. If he does not, he has no redress against the individual stockholder whom he now pursues; if he does, he is entitled to the relief provided for him in the circuit decree.
The defendant holds near fifty thousand dollars of the bills of the Ocmulgee Bank — bills in the ordinary form of that species of circulating currency of that and other banks, and so executed as to conform to the directions of the charter touching the execution of contracts, that should be binding upon the company; that is, they were signed by the President and Cashier. He received them as a security, when they first came into his possession, for cash advanced to the bank, that its existence might be saved against the destructive legislation of Georgia, in case it failed to maintain specie payments, resumed in 1841. The utmost good faith is conceded to him as a most meritorious creditor. He seeks to enforce against the South Western Rail Road Bank the liability arising under the following clause in the charter of the Ocmulgee Bank, to wit:
“ The persons and property of the stockholders, for the time being, of said bank, shall be pledged and bound, over and above the amount of said stocks paid in, in proportion to the amount of the shares that each individual, copartnership, corporation or body politic, may hold, in said bank, for the ultimate redemption of the bills or notes issued by or from said bank, in the same manner as in common commercial cases, or simple cases of debt.”
According to my apprehension of the ground work upon which the majority of the Court found themselves, it is this : The elemental functions of modern banking, all being combined in the charter of the Ocmulgee Bank, are, 1st. to receive deposites ; 2d. to make discounts ; 3d. to furnish a circulation that shall stand instead of money. They hold that the personal liability imposed upon the stockholder by virtue of the foregoing clause, is confined to the circulating currency proceeding from the Ocmulgee Bank; and that the idea of the circulating currency, so guarded, is to be restricted to those bills or notes that are not merely issued by the bank, but that are thrown, without restraint, into the volume of circulating bank bills. They draw the conclusion that inasmuch as Johnston took the bills he has produced, with an agreement or understanding that they should not go into circulation, according to their understanding of circulation and currency, these are not the bills or notes issued by or from the bank, within the contemplation of the charter. It is supposed we thus have an elemental, definite idea of the philosophy of banking, in its modern acceptation, much recommended by its precision, since it goes, pari passu, with *361 bank circulation, offered and received as money, not beyond it: and greatly commended also by its conformity to high public policy.
What is the root of this doctrine ? I conceive it to be this: Since the constitution of the United States, conforming to the practice of the commercial world, ordains as money, certain metals exhibiting the stamp of government, if a banking corporation be enfranchised by law, with a capacity and a credit that enables it to supplant the functions of that constitutional currency by another of its own, the same Jaw will give to those who part with their metallic currency for the substitute, the guaranty, for its ultimate redemption, of the persons and property of the individual stockholders.
I believe this to be good and sound doctrine, whether we examine language or policy. But where is the reason or authority that obliges or warrants us in restricting it to that particular banking substitute for money — that bank currency only — which takes the form of a common bank note, payable to bearer on demand, at a particular place ? and to that even, only when it goes forth as free as the air, clogged by no restraint that may withhold it from the great channel of circulation ? If one or a limited number, by agreement, take bank bills as money, and for money exchanges, are they not within the reason which provided the special protection ? If one or a given number agree to. hold bank bills received for money and as money, for the accommodation of the stock- ' holder, where is the reason or policy that should render him, (the stockholder,) in law or morals, less obliged to such friend than he would be to the adversary who clamors for redemption ? Currency implies motion: but how much motion ? Shall it be through the whole circle ? was there no motion to the currency that Johnston holds, when it proceeded from the fountain to his reservoir? I have said, why confine the personal security to a bank note ? It is to be answered, I presume, because that is currency for every body, and the object is to guaranty the currency. Is there any doubt that bank notes afford but one species of currency issued by banking corporations, and that they represent a smaller amount of coin, by far, than another currency, equally in universal use, called bills of exchange and bank checks? — (the latter being, according to modern construction, also bills of exchange.) Bills of exchange or checks are not the species of currency, as I suppose, which, in the opinion of the majority, draws to it that protection of the charter now under consideration. Why is this ? The charter speaks of “ bills or notes issued by or from the Bank.” How can it be said that a bill of exchange does not fulfil the definition ? It is a most important description of bank currency, and more frequently used as a substitute for actual coin than *362 bank bills. It must be within the reason, as it is within the better, of the law. Yet, a bill of exchange is payable to or-¿er — it is restrained from the utmost freedom of circulation, necessity of indorsement. The legal interest does not by delivery merely. It follows that if the personal liability of the stockholder is not secured to the bill of exchange, it must be because it is not payable to bearer. What word is to be found in the charter that confines such liability to currency, “ bills or notes,” payable to bearer ? Nay, what is there in the law that requires a bank note to be payable to bearer? If the Ocmulgee Bank had issued each of its notes payable to order, or payable to a specified person only, would it not have been a bill or note issued by or from the bank ? Suppose the bank had made each of its notes, though payable to bearer, in the sum of five thousand or even five hundred dollars, it could not be said that such notes would not be guaranteed by the personal liability; and yet there is no difficulty in perceiving that such a currency would not have been very nimble in its circulation, and would have served very few persons. The convenience and interest of the bank, no doubt, suggested other and lower denominations ; but the supposition serves to aid all the suggestions I have hitherto made, to show that the security of ultimate personal liability cannot safely be tested by the idea that it was intended to apply only to such bills, issued by the Oc-mulgee Bank, as might be free from every circumstance that might clog their course into the general current of bank circulation.
Waiving, however, the pursuit of such topics, and conceding (for the present purpose) what the view of the majority claims, to wit: that the personal liability relates to a bank bill unclogged by any restraint, in point of form, upon a free circulation as money, let us enquire when is a bank bill in circulation. Resorting to our common observation, we may state its qualities thus : it is a paper that does not differ in form or legal efFect from a promissory note, payable to bearer, (though, in the case of bank notes, at a particular place :) it is calculated to carry the obligation to pay, at that place, to any one who may hold it by delivery : it is subject to no equity, as between the various holders, when regularly transferred: it is,; in short, the element to the monetary system which the atmosphere is to organized creatures. The great quality, it seems, which commends the bank bill to the special protection of the charter in question, is its capacity for the utmost freedom of circulation — as money or bank currency, degraded by no contract or equity between the bank aud the holder which shall impair this essential quality. If this capacity be free, it does not matter whether it does circulate or not in point of fact. Then if it *363 be not the favored circulation or currency, when clogged by any such restraint, it may have that quality when and yet lose it (together with the favor and dignity, if the argument I am combatting be sound, which inhere in that quality,) before it reaches the bank counter, where it is redeemable, and before it be redeemed. I will endeavor to explain by illustration, and it is an illustration not founded merely in fancy. Suppose the very bills in question to have been delivered to Johnston upon a stipulation by him to pay them only to one A. B. who had also agreed to pay them only to the bank of Hamburg, his creditor, and that bank to have agreed to retain them, withdrawn from general circulation, for a settlement of balances between itself and the Oc-mulgee Bank — and that these several agreements formed the inducement for the issue — -is it not plain that the quality of the bills, as a circulating medium, in fact, would be stripped from them as effectually, and that too by agreement, when they reached the strong box of the bank of Hamburg, as if that disability had attached'to them the moment they were placed in Johnston’s hands ? Yet who will say that the bank' of Hamburg could not, in the case supposed, have enforced the liability of the stockholders ? It is a very insufficient a'nswer to say, that in, the case supposed, the bills had paid debts — that they had been received in payment and not as a pledge — for if the various contracts or understandings between the officers of a bank and its customers, looking to the olrject of keeping out its circulation and postponing redemption, are to enter into question as to the'personal liability of stockholders, it will be found that such contracts or understandings have generally consisted in restraints of the utmost liberty to the currency, by directing it into particular and friendly hands ; and the final result would teach us, I think, that the' security aimed at by the charter, was a futile obligation'. Besides, if Johnston had received these bills in payment of his debt, but with a promise not to circulate them, they would no more have been a part of the circulating medium, from hand to hand, in • such case, than they were in the case before the Court, .or a-re now. Moreover, in the casé I have supposed* they would have become a pledge, a collateral security, for balances, the moment they reached the bank of Hamburg, and would have been effectually withdrawn from the circulation, in the sense in which the majority of. the Court interpret that term. Nor will it do to say that bank bills cannot be held as a pledge s.o as to attract to them, in'that condition,’the personal liability of the stockholder. Without resorting to general principles or reasoning, the law of that point is ruled by the Georgia case, as well as others, cited in the circuit decree; and it is agreed, on all hands, that the ruling of Georgia cases, when the *364 true sense of their Courts can be ascertained, is binding upon us> jn aq tkat pertajns t0 the interpretation of their statutes. Now what difference can it make, in a practical or theoreti-ca^ a broad or a confined, an elevated or an humble view of banking, whether bills are withdrawn from circulation, upon previous contract, when they have reached first, or after they have passed through three hands? Will it be answered, that in the case I have suggested for illustration, the bills would have been returned as “bills in circulation,” in the semi-annual statement required for the Governor, and therefore, the case would be clearly distinguishable from that which is before us? The answers are ready to show the contrary : whether they would have been so represented or not, would be wholly independent of any act or power of the bill holder, in the actual or supposed case ; that was an affair entirely pertaining to the fidelity of the Ocmulgee Bank ; and whether the duty be performed or neglected, is in no wise a matter to affect the rights of the bill holder.— Nevertheless I am inclined to suspect that a consideration of some infidelity on the part of the Ocmulgee Bank, in this respect, and in regard to the bills held by the complainant, has insensibly exercised some potent influence in leading to the judgment pronounced. Let me ask — if these bills had, in fact, been reported by the bank to the Governor, as in circulation, would the decree have been against Johnston? I am apt to conclude it would not; and if I am right, what reason would be adduced? It would probably Be said, such an acknowledgment by the bank, would have shown that it regarded the bills in circulation, and the fact could not thereafter be disavowed. The restraint would, in law, have been withdrawn — the bills would have been emancipated — the world would have had the true table of circulation before it; other bill holders would have been advised of the weight resting upon a common security. But I have to reply, that such a return to the Governor would have given no new information to the stockholder sued in this case — the Rail Road Bank well knew the fact that Johnston held the bills, and for what purpose — the bank (the corporate officers) regarded these bills in circulation, except for the moment of time when, at their solicitation, they were returned to the bank, and held in their custody, for the very purpose that they might exclude them from the item of bills in circulation. I reply, further, that no other bill holder complains here that these bills were not entered in the semi-annual return. At all times, except upon the special occasions referred to, the bills were regarded as in circulation, and such is the language of White, the cashier, (vide page 5 of the prin-evidence.) He says, “ the notes were brought in whenever the semi-annual statements were made, as notes taken *365 out of circulation.” He adds, “ when brought in, the packages were never disturbed, and after the statements were made out, were handed to Mr. Johnston again.” The rights of no bill holder could be affected, as against a stockholder fully apprised of the facts, by the fair or fraudulent reports made to the Governor by the bank ; for the bank might have reported no bills in circulation at all. This is too plain to admit of argument. If the entry of these bills in the semiannual report, as in circulation, would give Johnston his redress, because he would thereby acquire the legal right to disregard his contract not to circulate them in other hands— while he did, in fact, keep his contract and forbear the exercise of his power, I think a decree for him, on such a ground, would pursue the shadow and not the substance.
The fatal disease of the complainant’s case, be it remembered, is, that his bills were to be withholden from the current of circulation. What was the practical effect of the agreement, and the object to be obtained by it? It was this; to procure from Johnston, who was willing to indulge, a sum to meet liabilities to those who pressed, upon a delivery to Johnston of notes payable, upon the face on demand, but accompanied by a promise or understanding that the legal lia-ability of the bank to pay on demand, should not be enforced; that the bills should remain in Johnston’s hands, an indulgent creditor of the bank, one who had made and was expected to make advances. Suppose each bill holder of the Ocmulgee Bank had in turn presented his bill for redemption, and the directors, instead of redeeming, should have induced him to wait for funds, and procured what specie he had in addition in exchange for other bills, and the bill holder chose to agree to retain his paper ’till it should be more convenient for the bank to redeem; are we to be told that this contract would have absolved the stockholders from all personal liability under the charter? Now this contract, we need not doubt, would have been readily made by every bill holder of this bank, provided he was able to retain so much of his means, if he could not have disposed of his bills without great loss, and was told, or knew, that the stockholders would be personally liable to him. Yet I have supposed a case not essentially differing from Johnston’s, in its distinguishing attributes or objects, and which would have arrested the entire circulation of the bills of the bank as a substituted currency for money.
But it may be said, the bills (in the case put) have been in unrestrained circulation — they have once been set afloat by the bank, as a free currency, with no restraint attached, equitable or legal. Then suppose the Bank had redeemed them, and immediately recovered the specie paid for them) and re-issued them, upon the terms supposed, to the bill *366 holder — wherein should we find the cáse varied ? The stockholder could complain of no fraud, his liabilities would ' not be increased : a bill holder would call upon him to respond, one who had acted bona fide, who had parted with . specie, absolutely his own, for the note; one who would ful-fil the character in which the complainant appears, so far as I can discover, in every essential and substantial particular. Would the promise not to circulate- the bills, not to part with their possession, be binding? Was such a promise by Johnston binding upon him? We, of the Common Pleas, are constantly announcing that a promise without consideration is not obligatory. Nay, it is not unfamiliar doctrine, that where a creditor promises the principal debtor to forbear action beyond the terms of the contract, if that promise have no consideration to support it, the surety may not avail himself of any defence arising from it — for it is a mere nullity, and does not change the legal relation of the parties. I will not be bold enough to affirm any thing upon a point not argued, in this case, at the.Bar, but I am not prepared to assume what has been elsewhere suggested, that Johnston may not have brought action on his bills instanfer against the corporation. What was the consideration to him? The benefit was all the bank’s. To approach a little closer to the question : More than a year after Johnstop obtained the bills, the directors adjusted his account. He obtained the bill's either about the middle of the year 1841, or earlier according to Breeze, and his account was adjusted on the 3d October, 1842. On that day (says White, the Cashier) “$96,951, 05, is carried' to the credit of Mr. Johnston on the personal ledger as cash, and in the weekly statement of the debit of the bank as deposite bearing interest.” On the 30th August 1842, the daily cash Book exhibited an entry, as follows, “Bonds due W. B. Johnston & Co. cancelled and given up $80,000.” ' “Due bills or memoranda were given to Mr. Johnstop (says White) until his account was adjusted by the Board of directors.” “In' this investigation (says Breeze) it appeared from the book that W. B. Johnston & Co. were creditors of the Bank to the amount of $80,000, by bonds issued by the bank to W. B. Johnston <fc Co.” Now 'after the adjustment of Johnston’s demand,, after it became a cash de-posite, payable instantly to- him, if he had demanded the redemption of the bills he held, and it had been denied, and thereupon he had sued the bank upon them, or announced his resolution to put them in circulation'by a sale to those who would buy them, would -a Court of Equity have enjoined him ? I dare not pronounce upon a subject of Equity jurisprudence, but according to any glimmering light before me, I do not think Johnston would have been restrained.' I am persuaded a Chancellor would have reasoned thus; John *367 ston’s demand is most meritorious; he has been forbearing ; he has advanced in hard and hazardous times, cash large amounts, to sustain the very existence of the Ocmulgee Bank, and his money has actually-redeemed the circulation and engagements of the bank, so far as it went, (the testimony is so;) the directors have issued to him bonds which have been rendered up ; they have deposited bills, understood and intended, on both sides, to impose the charter liability on individual stockholders; his demand has been made to assume the form of a cash deposite, payable presently; payment of the collateral paper has been refused, and is now become an absolute obligation; tho’ originally received with a condition annexed, that condition has vanished with the motive on which it was founded ; it never could have been designed to be perpetual; it was co-extensive only with the credit; when the debt has become due it is inequitable and unreasonable that such a creditor shall be held motionless, while he sees the substance of his debtor melting away, and his best and only means of resort shall be yet impounded. If such would be the reasoning of a Chancellor, in the case supposed, then the bills of the complainant would be emancipated — and if so, then they were emancipated; for I conceive that I have stated no more than Johnston’s case' as now made. What Johnston had the lawful right to do is the test of the question, say the majority ; for if his power over the bills became unshackled, they were then in circulation, to all intents and purposes, whether he exerted it or not; whether they actually reached one hand or one thousand hands.
I apprehend the idea that leads a majority of the Court would be applicable, if we had different parties before us, and one more fact proved, to wit, the insufficiency of the assets of the corporation, as well as the private means of the stockholders, to respond to the bill holders, in the aggregate. If Johnston and other bill holders who had received their paper in the ordinary course of business were pressing their claims against an insolvent corporation and a set of insolvent .stockholders, I could appreciate the application of the argument, now used, in behalf of those who were bill holders, under ordinary circumstances, claiming to push Johnston behind them in appropriating a fund and a liability insufficient for the whole. They might urge, with a shew of reason, that they had taken theii bills with a reference to two items in the semi annual returns of the Ocmulgee Bank, to wit, the names of the stockholders, who owed them a personal liability, and the amount of the bills in circulation, which measured the extent of that liability. They might urge that Johnston, whether with design or not, yet with a knowledge of the effect of his conduct, had lent himself to the purpose of concealing from them the true extent of the stockholders’s lia *368 bility. In the absence of any such complaint, of any such ; party, I am at a loss to see upon what recognized principle of jurisprudence, in any of its departments, or what accepted code of moral law, the stockholder shall avail himself of such an equity or such an argument; and thus substantially transmute himself into the semblance of a bona fide bill holder, boldly stalk into Court in his habiliments, in such feigned character raise a clamor against his own wrong and fraud, and finally chase off one victim of his deception, because, perchance, he has deceived some others more.
1 Kelly.
If we had such parties and such a question before ns as I have supposed, Johnston might well dread the case of Collins v. The Central Bank, as well as the general reasoning, if he was able to shew no more than Collins did. But he has been able to shew much more. In the commentary upon that case, to be found in the circuit decree, aided by the subsequent case adjudged on circuit in Georgia, the copy record of which has been produced before this Court, the distinctions in favor of Johnston as a bill holder are satisfactorily set forth, and to my understanding they are plainly perceptible. I will not reproduce them here, for I wish to regard the patience of hearers and the economy of time. But it ought never to be forgotten, that the parties, in the case of Collins v. The Central Bank, were very different from those here— bore very different relations to each other; and fulfilled the conditions, not of the present case, but of that which I described by way of illustration in the paragraph preceding. There, the Court, in their brief argument, insisted that to place Collins on the fooling of other bill holders, (where the claim was to a specific and inadequate fund, and where Collins had taken another and different security, to wit, a mortgage) “would be, in our judgment, to sanction a fraud on the right of those bill holders whose bills are legitimately issued and put in circulation as money, according to the terms and provisions of the charter. On this ground of exception we most cheerfully concur in opinion with the Court below.” Now what fraud has been or can be imputed to Johnston up-. on the Rail Road Bank ? It was the idea of circumventing a fraud by one party on another, before the Court of Georgia, that quickened that tribunal into a cheerful concurrence with the Court below, in construing words in a bank charter equivalent to those in that of the Ocmulgee Bank. They were construing it in reference to the parties and the question before them. The view, however, above cited as furnishing the medium though which the Georgia Court looked at their object, is entirely wanting in the case before this Court, when we turn towards the complainant, but it is not wanting when we direct our vision towards the South Western Rail Road Bank. It is conceded that the complainant is *369 not chargeable with fraud, but that the South Western Rail Road Bank is. It is conceded that the transfer of 1750 shares by that corporation to Collins was fraudulent so far as bill holders were concerned — that is to say, a class of bill holders not before the Court and making no complaint. we have just heard it decided that the particular bill holder, who furnished the agents of this same fraudulent stockholder (who knew it and made no objection) with the means of silenciqg the clamors of the favoured class, taking upon his own shoulders the burthen to the extent of $50,000 of circulation, and who was so unfortunate as to confer another special favor, to wit, to indulge to the bitter end, by way of withholding the bills in his possession from the hand of the enemy — this patient and special friend, who adhered to the fortunes of our stockholder when all besides had abandoned him; who advanced him $3,800 without even his note for security, he is told that his kindness has been fatal to his claim — that the person and property of the stockholder are sacred from his touch — and he is remitted to a scramble for a share of the assets of the corporation, only — “a beggarly shew of empty boxes.” If we had better look to the spirit than the letter of a decision, as of a statute, which I hold to be a true precept, we shall gain nothing from the Georgia case of Collins v. the Central Rail Road. I think we are taught by that case, to be astute so to construe a statute as to conform it to sound morals — to borrow from that code a shield to protect the bona fide bill holder of a banking corporation, and not to throw the panoply designed for him over a fraudulent stockholder.
I believe, moreover, that Johnston has well urged the subsequent Georgia case as an authority to support his claim. It does certainly show that bank bills attended upon the issue by an absolute restraint from circulation for a specified time, upon express contract, actually withholden from circulation accordingly, received as a pledge or collateral security for a debt, were nevertheless attended by the personal liability of a stockholder. Upon these cases from Georgia I forbear to enlarge, for a reason already suggested, and also because they were well treated of in the circuit decree, and I doubt not will be more fully discussed in the dissenting opinion expected from the circuit Chancellor.
I believe the complainant’s case is fully sustainable, if we admit all that can be said against him as a bill holder up to a certain time; that is to say, when Johnston’s debt was adjusted, when he gave up the bonds he held, or whatever he did hold as evidence of debt to which the bills were collateral, those bills, no longer collateral, were the primary evidences of debt by the bank to Johnston as a bill holder, and one of the most meritorious, free from all qualification. I have al *370 ready endeavored to shew he would not have been restrained from circulating them, and I presume the only reason he did not was, that they would not bring par value, or else he was g'tju steady to the service of the bank’s convenience or necessity, fully relying all the while upon the security of the stockholders, which was intended to be given to him and which he thought he had acquired.
My opinion is, that the complainant deserves to be reputed a bill holder to all intents and purposes, and to have redress accordingly.